FILED

03/28/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0500

DA 22-0500

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2023 MT 52N

IN RE THE PARENTING OF:

H.R.H-H.,

    a minor child.

CULLEN JAMES HOSKIN,

       Petitioner and Appellant,

and

ROBBYN LYRE HERGENRIDER,

       Respondent and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the Thirteenth Judicial District,<br>In and For the County of Yellowstone, Cause No. DR 21-0641<br>Honorable Ashley Harada, Presiding Judge |

COUNSEL OF RECORD:

       For Appellant:

              Adrian M. Gosch, Towe, Ball, Mackey, Sommerfeld & Gosch, Billings, Montana

       For Appellee:

              Jill Deann LaRance, LaRance Law Firm, P.C., Billings, Montana

                       Submitted on Briefs: March 8, 2023
                              Decided: March 28, 2023

Filed:

_____
                  Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, we decide this case by memorandum opinion. It shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Cullen Hoskin appeals the final parenting plan entered by the Thirteenth Judicial District Court. Cullen argues that the District Court erred when it calculated support for the parties' minor child by imputing income to Cullen; admitted into evidence and relied on an anonymous letter disparaging the child's mother, Robbyn Hergenrider; and admitted into evidence and relied on an exhibit prepared by Robbyn comparing the anonymous letter to Cullen's diary entries. We conclude that the District Court did not abuse its discretion when it imputed income to Cullen based on unsatisfactory proof of his disposable income or when it admitted the anonymous letter over Cullen's hearsay objection. The District Court improperly admitted Robbyn's exhibit comparing the letter to Cullen's diary, but this error did not prejudice Cullen's substantial rights and does not warrant a reversal. We affirm.

¶3 H.R.H-H. was born in January 2021 to Robbyn and Cullen. Since birth, H.R.H-H. has lived with Robbyn in Billings. Robbyn and Cullen are not married and have never shared a residence together. Cullen lives in Bridger, about an hour away from Robbyn's

house. Robbyn repeatedly has told Cullen and his family that they are welcome to visit H.R.H-H. Shortly after H.R.H-H's birth, Robbyn brought H.R.H-H. to Bridger to visit Cullen. Cullen, however, did not travel to Billings to see H.R.H-H. between February 21, 2021, and August 24, 2021.

¶4 On August 5, 2021, Cullen filed a petition with the District Court requesting a formal parenting plan. Both Robbyn and Cullen submitted proposed parenting plans to the court. The court held a three-day bench trial in July 2022. Over Cullen's hearsay objection, the court accepted into evidence an anonymous letter that Robbyn received before the trial. The multi-page letter included significant amounts of profane language and accused Robbyn of being a "horrible" mother to H.R.H-H. The court also permitted Robbyn to enter an exhibit into evidence comparing the anonymous letter to diary entries authored by Cullen and purporting to demonstrate the grammatical similarities between the two. Cullen objected to this exhibit as improper expert testimony.

¶5 On August 2, 2022, the District Court entered its findings of fact and conclusions of law, coupled with a final parenting plan order. The court awarded primary custody to Robbyn, with Cullen receiving one weekly overnight visit beginning immediately and increased parenting time as H.R.H-H. ages. The court also required Cullen to pay child support and to contribute retroactively to H.R.H-H.'s care and medical expenses. The District Court did not determine who wrote the anonymous letter but concluded that it contained details that only someone "closely connected to the situation" would know. As

a result, it forbade family members—on both sides—from providing childcare or having interactions with H.R.H-H. outside the presence of Robbyn or Cullen.

¶6 "We review a parenting plan order to determine if the court's findings are clearly erroneous." *In re Marriage of Woerner*, 2014 MT 134, ¶ 11, 375 Mont. 153, 325 P.3d 1244 (citation omitted). "When the findings are supported by substantial credible evidence, we will affirm the district court's decision unless a clear abuse of discretion is shown." *In re Marriage of Epperson*, 2005 MT 46, ¶ 17, 326 Mont. 142, 107 P.3d 1268 (citation omitted). We also review evidentiary rulings for abuse of discretion. *In re Marriage of Anderson*, 2014 MT 111, ¶ 11, 374 Mont. 526, 323 P.3d 895. "A district court abuses its discretion where it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in a substantial injustice." *In re Marriage of Anderson*, ¶ 11 (citation omitted).

¶7 Cullen limits his appeal to the calculation of child support and the two evidentiary rulings. He also requests attorney's fees. Cullen argues that the District Court "failed to apply the rules of the Montana Child Support Guidelines" when it imputed income to him. He maintains that the court erred in crafting its parenting plan by relying on the anonymous letter and on Robbyn's inadmissible expert testimony comparing it with Cullen's diary entries.

¶8 Robbyn responds that the District Court correctly imputed income to Cullen because it had reason to doubt that the tax returns Cullen introduced accurately reflected his

disposable income. Robbyn maintains that the anonymous letter properly was considered because it was not hearsay but admitted to show the emotional distress that Robbyn experienced when she received it. Robbyn also argues that her comparison exhibit properly was admitted as a summary of Robbyn's observations pursuant to Montana Rule of Evidence 1006. Finally, Robbyn too requests attorney's fees and costs on appeal, contending that Cullen's appeal is frivolous.

*Calculation of Child Support*

¶9 Cullen testified to his income and provided his tax returns for the previous three years. Cullen's expert witness, who testified on his tax returns, reported the net income from Cullen's farm for the last three years: negative $13,917 in 2019; $53,102 in 2020; and negative $18,342 in 2021. Cullen's tax returns reflect the following gross income: negative $588 in 2019; $3,215 in 2020; and $555 in 2021. The expert testified that the income from 2020 was an anomaly because of loans that Cullen obtained as a result of COVID-19 relief legislation and income from the Western Sugar Co-Op. Cullen estimated at trial that he makes about ten dollars an hour. Cullen also testified that he has a commercial driver's license and acknowledged that he could work as a truck driver if he so desired. Robbyn admitted an exhibit over Cullen's objection reflecting the federal wage statistics for Montana truck drivers. Using these statistics, the court imputed $50,130 income to Cullen in its child support calculations because it found that Cullen could be earning that much and that this amount more "realistically" reflected Cullen's disposable income. The court

5

also ordered that Cullen pay Robbyn $15,276 in back child support as well as $4,683 for his share of H.R.H-H.'s medical and birth expenses, noting that he had contributed nothing since the child's birth.

¶10 Cullen argues that the court did not follow the Child Support Guidelines' instructions to consider his "actual income." He maintains that it was improper to rely on the wage statistics that Robbyn provided to impute income he theoretically could earn as a commercial truck driver. Robbyn counters that it was proper to impute this income because there were multiple reasons to discount the evidence on Cullen's reported income, including his accountant's lack of credibility, the large expenditures Cullen claimed as tax deductions after he became aware that he would owe child support, the conflicting testimony on how much Cullen makes, and Robbyn's difficulty in obtaining discovery from Cullen regarding his income.

¶11 A court must consider the factors set forth in § 40-4-204, MCA, as well as the Child Support Guidelines in the Administrative Rules of Montana when determining child support. *In re Marriage of Anderson*, ¶ 13. "When determining income under the guidelines, the court must consider the disposable income of the parent, not their income tax returns alone." *In re Marriage of Frank*, 2022 MT 179, ¶ 78, 410 Mont. 73, 517 P.3d 188. "Income can never be less than zero." Admin. R. M. 37.62.105(1). Income is imputed to a parent when the parent is unemployed, underemployed, or fails to produce sufficient proof of income. Admin. R. M. 37.62.106(2). "Calculation of a parent's imputed

6

income is based on the parent's recent work history, the parent's occupational and professional qualifications, and existing job opportunities and associated earning levels in the community or local trade area." *In re Marriage of Carter-Scanlon*, 2014 MT 97, ¶ 27, 374 Mont. 434, 322 P.3d 1033 (quoting Admin. R. M. 37.62.106(3)(a)-(c)).

¶12 The court heard conflicting testimony on Cullen's income and concluded that Cullen did not provide credible evidence of his disposable income beyond his tax returns. His tax returns reflected the net profit and loss from his farm, but he also testified that he estimated his income to be approximately ten dollars an hour. The tax accountant who prepared Cullen's taxes did not testify, and the accountant who did testify admitted to some errors on the tax returns and that she assumed certain deductions. The accountant acknowledged that any information on Cullen's tax returns was provided by Cullen. Cullen testified that he had recently made large purchases, including a $107,000 tractor; a $40,867 baler; and a $14,013 tractor. Cullen also testified to purchasing a surveillance camera for more than $7,000. The District Court had sanctioned Cullen for not disclosing certain farming contracts to Robbyn prior to the hearing. These contracts thus were not reviewed fully at the hearing. In his proposed child support assessment, Cullen suggested that he earned $19,136 annually. Finding insufficient proof of Cullen's disposable income, the court noted that Cullen had a commercial driver's license and "could work as a truck driver if he wanted to." Accordingly, it imputed the average wage of a Montana truck driver to Cullen when calculating child support.

¶13 We will reverse the District Court's judgment only if the appellant demonstrates a clear abuse of discretion. *In re Marriage of Anderson*, ¶ 11. Though Cullen has never worked as a truck driver and engages in full-time farming and ranching, the District Court had discretion to reject his suggested income based on its determination that he had not substantiated it with credible evidence. The court acted within the Child Support Guidelines for imputing income because Cullen 'fail[ed] to provide sufficient proof of income." Admin. R. M. 37.62.106(2)(c). Cullen has not demonstrated that the court abused its discretion by imputing income when calculating child support.

¶14 Further, the court was not wrong to rely on the wage statistics Robbyn provided when it calculated the income to impute to Cullen; these statistics were published by the United States Bureau of Labor Statistics. The court relied on the Montana-specific statistics included in the publication. Official publications issued by public authority are self-authenticating and admissible pursuant to Montana Rule of Evidence 902(5). The wage statistics fit this description. The court did not abuse its discretion when considering them.

*Evidentiary Rulings*

¶15 Cullen argues that the anonymous letter was improper hearsay testimony. He argues further that the letter should have been excluded as unduly prejudicial under Montana Rule of Evidence Rule 403. First, Cullen did not raise a Rule 403 objection to the letter at trial, nor does he now ask us to review its admission for plain error. We will not entertain

arguments that were not raised at the district court level and thus do not consider his Rule 403 argument. *See In re Estate of Bradshaw*, 2001 MT 92, ¶ 33, 305 Mont. 178, 24 P.3d 211.

¶16    A statement is inadmissible as hearsay when it is offered to prove the truth of the matter asserted by someone other than the declarant while testifying at a trial or hearing. Mont. R. Evid. 801(c), 802. "By definition, out-of-court statements not entered to prove the truth of the matter asserted are not hearsay." *State v. Butler*, 2021 MT 124, ¶ 16, 404 Mont. 213, 487 P.3d 18. The letter included aggressive language about Robbyn's character and her ability to be a mother. Robbyn admitted the letter into evidence to prove the effect it had on her, not to prove that anything in the letter was true—and Cullen made no argument that it was. Admitting the letter for another purpose did not violate hearsay principles. *See Moats Trucking Co. v. Gallatin Dairies*, 231 Mont. 474, 479, 753 P.2d 883, 886 (1988) (a statement that might otherwise be hearsay can be admitted for the purpose of demonstrating the effect that the statement had on a listener).

¶17    Further, the court did not use the letter for the truth of any allegations it made. The court referenced the letter when it considered the mental and physical health of all individuals involved, pursuant to § 40-4-212(e), MCA, in its findings of fact and conclusions of law. Under this factor, the court decided to limit which adults could watch or interact with H.R.H-H. outside the presence of her parents because it did not want the letter's author to repeat their thoughts about Robbyn to H.R.H-H. The court considered

9

Robbyn's reasonable reaction to the letter in determining whether H.R.H-H. should be left unsupervised with others.

¶18 Importantly, the court relied on other testimony and evidence to reach its decision to limit the contact that H.R.H-H. has with other adults. The court heard testimony at the hearing that Cullen's sister, a Bridger police officer, had been following Robbyn in her squad car and reporting on her whereabouts to Cullen's family. Additionally, Cullen's sister provided him with a police body camera to film exchanges with Robbyn without her knowledge. The District Court also considered the "negative and demeaning text messages" that Robbyn would receive if she did not agree to Cullen's specific demands for parenting. The court found that Robbyn had "worked diligently to accommodate Cullen's requests to see H.R.H-H." and that "Cullen has refused to work with Robbyn to implement a month-long schedule for visits." In light of the court's findings and the trial record as a whole, Cullen has not established abuse of discretion in the court's consideration of the anonymous letter.

¶19 Next, Cullen argues that the court improperly admitted an exhibit comparing the similarities of the anonymous letter to diary entries that Cullen introduced into evidence. Cullen maintains that, by admitting this exhibit, the court allowed Robbyn to provide "her own self-serving expert opinion and analysis concerning the contents of the anonymous letter." Cullen contends that allowing this exhibit resulted in the court concluding that Cullen or someone close to Cullen must have written the letter. The court explained at trial

that it would be "prudent" for it to consider the similarities between the letter and Cullen's diary entries.

¶20 Montana Rule of Evidence 702 allows a witness to testify as an expert if the witness possesses scientific, technical, or other specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue. Expert testimony is appropriate in areas "not within the range of ordinary training or intelligence." *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, ¶ 48, 289 Mont. 1, 961 P.2d 75. We have considered the examination of questioned documents to be a topic on which an expert would testify. *See State v. Evans*, 247 Mont. 218, 228-29, 806 P.2d 512, 518-19 (1991). Reviewing the record reveals that Robbyn did not provide a foundation that would allow her to analyze a questioned document.

¶21 Robbyn counters, however, that this exhibit was entered simply as a summary of observations pursuant to Montana Rule of Evidence 1006. "For a summary to be admissible under M. R. Evid. 1006, it must meet two requirements: (1) the underlying material upon which the summary is based must be admissible in evidence; and (2) the underlying materials must be made available to the opposing party for inspection." *In re the Marriage of Fossen*, 2019 MT 119, ¶ 19, 395 Mont. 495, 443 P.3d 418. The underlying material of Robbyn's exhibits were not the diary entries or the letter but rather her observations purporting to compare the two. As mentioned, Robbyn's "observations"

11

comparing these documents were inadmissible expert testimony. The court accordingly abused its discretion when it admitted this exhibit.

¶22 We reverse for an evidentiary error only if the error affects a party's substantial rights. *In re S.C.*, 2005 MT 241, ¶ 29, 328 Mont. 476, 121 P.3d 552. The court did not, as Cullen alleges, determine that Cullen wrote the letter. Nor did the court determine that someone from Cullen's family wrote the letter. The letter was addressed only under the mental and physical health of the parties. There, the court noted that, though the "author of the letter is unknown," whoever wrote the letter was intimately involved in the personal and private details of Robbyn's life. The court also noted that the letter had similarities to the diary entries that Cullen submitted. The court had both the letter and the diary entries in evidence; it did not need Robbyn's exhibit to draw its own conclusions between the two. Though the court limited the people "who will be in the presence of H.R.H-H. without parental supervision," it did not rely solely on the letter or the exhibit to make this determination. The court considered the animosity between the families as presented by witness testimony, concluding from that evidence "that a positive co-parenting relationship is not possible with Cullen and his family." The court applied the same limitation equally both to Robbyn's family and to Cullen's family.

¶23 Further, the record reflects that the court considered a host of other factors, supported by testimony presented by witnesses from both parties, to conclude that the parenting plan fit within H.R.H-H.'s best interests. In its findings of fact and conclusions

12

of law, the court considered the best interest of the child pursuant to the factors identified in § 40-4-212, MCA. The court heard testimony that Robbyn provided a safe, secure, and stable home and life for H.R.H-H. The court considered Robbyn's efforts to facilitate time between H.R.H-H. and Cullen, including multiple trips she made to Belfry and Bridger shortly after H.R.H-H.'s birth; offers to Cullen for him to watch H.R.H-H. during Robbyn's doctor's appointments; and multiple attempts to communicate with Cullen regarding time with H.R.H-H. via phone call and text. The court also observed that H.R.H-H.'s current routine in Billings met her physical, emotional, and mental needs. The court also heard evidence that Cullen had not intended until recently to exercise much parenting time. Additionally, it found that Cullen's work schedule was not conducive to his requested week-to-week parenting schedule, particularly at H.R.H-H.'s young age. The court observed that Cullen did not have a plan for childcare in place. The court had reason to believe that Cullen fabricated stories that Robbyn was withholding H.R.H-H. from Cullen and his family. Cullen's diary entries included specific dates that he or a family member had seen Robbyn and H.R.H-H. in Bridger without coming to visit Cullen or his family members. Robbyn, however, provided clear evidence that she had not been to Bridger on those dates.

¶24 "[W]e must presume that the court carefully considered the evidence and made the correct decision" when considering the parenting of a child. *In re the Marriage of Crowley*, 2014 MT 42, ¶ 44, 374 Mont. 48, 318 P.3d 1031. We will not substitute our judgment for

13

the District Court's parenting plan if the record contains substantial credible evidence to support the court's findings. *In re the Parenting of D.C.N.H.*, 2020 MT 119, ¶ 21, 400 Mont. 59, 463 P.3d 445. We conclude that the record as a whole contains substantial credible evidence to support the District Court's findings and that even without the anonymous letter or Robbyn's exhibit comparing it to Cullen's diary entries, the court had an adequate evidentiary basis for its determination.

*Attorney's Fees*

¶25 Cullen requests that we remand and award him attorney's fees. Robbyn in turn requests attorney's fees, arguing that Cullen's appeal is frivolous. Cullen requested attorney's fees if the matter were remanded to the District Court, and his request is thus refused. This Court may award sanctions on appeal "if the appellant's claims for relief are 'frivolous, vexatious, filed for purposes of harassment or delay, or taken without substantial or reasonable grounds.'" *In re the Marriage of Brown*, 2016 MT 299, ¶ 24, 385 Mont. 369, 384 P.3d 476 (quoting M. R. App. P. 19(5)). Cullen's claims, on the whole, were not taken without substantial or reasonable grounds. Accordingly, we also decline to award Robbyn attorney's fees and costs on appeal. *See In re Marriage of Tummarello*, 2012 MT 18, ¶ 42, 363 Mont. 387, 270 P.3d 28 (citing *In re Chamberlin*, 2011 MT 253, ¶ 26, 362 Mont. 226, 262 P.3d 1097).

¶26 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. Exercising its

14

discretion to find the facts in a contentious parenting dispute and applying established law to its findings, the District Court did not commit reversible error.  We affirm.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JIM RICE
/S/ DIRK M. SANDEFUR